## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| NCTA – INTERNET & TELEVISION ASSOCIATION, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket No. 2:19-cv-420-NT |
| | ) | |
| AARON FREY, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ON PLAINTIFF'S CLAIMS FOR DECLARATORY AND INJUNCTIVE RELIEF

Last year, Maine enacted L.D. 1371, "An Act To Ensure Nondiscriminatory Treatment of Public, Educational and Governmental Access Channels by Cable System Operators" ("**LD 1371**"), which contains a number of provisions dealing with how cable operators provide and support public, educational, and government access channels ("**PEG channels**"). Among other things, LD 1371 requires cable operators: 1) to place PEG channels in positions near local broadcasting stations on the basic tier; 2) to retransmit PEG channel signals in the format in which they are received from PEG channel originators and at the same signal quality as local broadcast channels; and 3) to provide PEG channel originators with access to cable television services' electronic programming guides (the "**PEG provisions**"). 30-A M.R.S. §§ 3008, 3010. In addition, the law requires cable operators to extend cable service to areas that have a population density of at least 15 residences per linear strand mile (the "**line extension provision**"). 30-A M.R.S. § 3008.

Plaintiff NCTA – The Internet & Television Association ("**NCTA**"), a national trade association representing cable operators,[1] challenges the above provisions of LD 1371 as facially unconstitutional. NCTA claims that all four provisions are preempted by federal law that governs cable communications, 47 U.S.C. §§ 521–573[2] ("**Federal Cable Law**"), and claims that the PEG provisions also violate the First Amendment rights of its cable operator members. For the reasons that follow, I **DENY** the Plaintiff's claims for declaratory and injunctive relief.[3] (ECF No. 1.)

## BACKGROUND

### A.    Federal Cable Law

"The earliest cable systems were built in the late 1940's to bring clear broadcast television signals to remote or mountainous communities." *Turner Broad. Sys., Inc. v. FCC* ("*Turner I*"), 512 U.S. 622, 627 (1994). Cable operators, in contrast to broadcasters that send signals over the airwaves, rely on a "physical, point-to-point connection between a transmission facility and the television sets of individual subscribers." *Id.* at 627–28. In order to lay the cables necessary for the development

---

[1]    Comcast and Charter are NCTA members that operate in Maine.

[2]    Federal law governing cable is codified at 47 U.S.C. §§ 521–573. First enacted in 1984, *see* Cable Communications Policy Act of 1984, Pub. L. No. 98–549, 98 Stat. 2779 (the "**1984 Cable Act**"*),* these provisions have been amended over time, most notably in 1992, *see* Cable Television Consumer Protection and Competition Act, Pub. L. No. 102-385, 106 Stat. 1460 (the "**1992 Cable Act**"), and in 1996, *see* Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56. (the "**1996 Cable Act**"). I refer to the provisions currently codified at 47 U.S.C. §§ 521–573 as "Federal Cable Law."

[3]    The Plaintiff originally filed a motion for a preliminary injunction. (ECF No. 3.) I ordered expedited briefing and set a hearing on the Plaintiff's motion. Both parties declined an invitation for an evidentiary hearing and opted to proceed by submitting affidavits and presenting oral argument. I decided to consolidate the motion for preliminary injunction with the trial on the merits of the Plaintiff's claims. Neither party objected. The Plaintiff's motion for preliminary injunction is therefore **MOOT**.

of cable systems, cable operators used public rights of way. As a result, the cable medium has always depended "for its very existence upon express permission from local governing authorities." *Id.* at 628.

For many years, cable television was primarily regulated by local governments through a franchise process. H.R. Rep. No. 98-934 at 4656–57, *reprinted in* 1984 U.S. Code Cong. & Admin. News ("**House Report 98-934**"). A municipality would grant a cable operator a franchise that contained specifics about the nature of the system to be built, the services to be provided, and the rates to be charged. *Id.* at 4656. States also got in on the act. Some states acted as the franchising authorities or had processes for approving local franchise agreements; others regulated the terms of what was to be included in municipal franchise agreements. *Id.* In addition, over time the federal government, through the Federal Communications Commission ("**FCC**"), began to play a regulatory role, mostly in the operational aspects of cable, especially technical standards and signal quality. *Nat'l Cable Television Ass'n v. FCC,* 33 F.3d 66, 68–69 (D.C. Cir. 1994); House Report 98-934 at 4656–57.

With the 1984 Cable Act, Congress regulated cable television for the first time by adding "provisions governing the operation of cable providers and franchises" to the Communications Act of 1934. *All. for Cmty. Media v. FCC*, 529 F.3d 763, 767–68 (6th Cir. 2008). In the 1984 Cable Act, Congress continued to rely "on the local franchising process as the primary means of cable television regulation, while defining and limiting the authority that a franchising authority may exercise through the franchise process." House Report 98-934 at 4656. Wanting to encourage the

3

growth of the cable industry, Congress sought to " 'reliev[e] the cable industry from unnecessary, burdensome regulation.' " *Liberty Cablevision of P.R., Inc. v. Mun. of Caguas*, 417 F.3d 216, 219 (1st Cir. 2005) (quoting *Am. Civil Liberties Union v. FCC*, 823 F.2d 1554, 1559 (D.C. Cir. 1987)). At the same time, Congress sought to " 'ensur[e] that cable systems remain responsive to the needs of the public.' " *Id.* As one commentator noted:

> Through the [1984] Cable Act, Congress recognized cable's multifunctional nature and took a position favoring a mixed scheme of federal, state and local regulation of the medium. Congress prescribed uniform rules for those aspects of cable television that it perceived to require federal attention. It left the substantial remainder of cable regulatory authority to state and local governments who, arguably, are in a better position to ascertain local needs and to design rules that best meet local conditions.

R. Copple, *Cable Television and the Allocation of Regulatory Power: A Study of Government Demarcation and Roles,* 44 Fed. Comm. L.J. 1, 4 (1991).

To this day, local franchising authorities retain the right to award and renew franchises, 47 U.S.C. §§ 541, 546, and "establish requirements for facilities and equipment." 47 U.S.C. § 544(b)(1). But states and franchising authorities are generally not allowed to regulate rates charged by cable operators that are subject to effective competition, 47 U.S.C. § 543(a)(1)–(2), and they cannot prohibit, condition, or restrict a cable system's use of subscriber equipment or transmission technology. 47 U.S.C. § 544(e).

Federal Cable Law provides cable operators with various protections, including procedures and standards that govern the renewal of incumbent cable franchises. *See* 47 U.S.C. § 546. In contrast to the initial franchising provision, which contains little

detail, *see* 47 U.S.C. § 541, the renewal provision sets forth a process that requires consideration of the cable operator's track record, the quality of the cable operator's service, and whether the cable operator's proposal "is reasonable to meet the future cable-related community needs and interests, taking into account the cost of meeting such needs and interests." 47 U.S.C. § 546(c)(1)(A)–(D). If a franchising authority decides not to renew a franchise agreement, a cable operator is entitled to an administrative hearing with basic due process protections. 47 U.S.C. § 546(c)(2). A franchising authority must support any adverse decision in writing, and a cable operator can seek judicial review of any adverse decision. 47 U.S.C. § 546(c)–(e).

Federal Cable Law also contains provisions governing PEG channels. 47 U.S.C. §§ 531, 541(a)(4)(B). Congress considered PEG channels to be the "video equivalent of the speaker's soap box or the electronic parallel to the printed leaflet" and important to ensuring a diversity of voices and an informed citizenry. House Report 98-934 at 4667. Congress included provisions allowing franchising authorities to require "adequate assurance that the cable operator will provide adequate public, educational, and governmental access channel capacity." 47 U.S.C. § 541(a)(4)(B). Franchising authorities retained the rights to include requirements for the designation and use of PEG channels in their requests for initial proposals and renewals, 47 U.S.C. § 531(b), and to enforce any requirements within their franchise agreements "regarding the providing or use of such channel capacity" including

> the authority to enforce any provisions of the franchise for services, facilities, or equipment proposed by the cable operator which relate to public, educational, or governmental use of channel capacity, whether or not required by the franchising authority.

47 U.S.C. § 531(c).

## B.     Maine's Regulatory Structure and LD 1371

Maine has expressly authorized municipalities to enter franchise agreements with cable operators. 30-A M.R.S. § 3008. Maine law regulating the cable industry is found at 30-A M.R.S. §§ 3008–3010. Section 3008(5) contains various requirements that municipalities must include in franchise agreements. Section 3010, entitled "Consumer rights and protection relating to cable television service," sets forth consumer protection and customer rights provisions that apply directly to cable operators.

LD 1371 amends § 3008(5) and § 3010 to address concerns about PEG channel access. Within the last several years, cable operators began taking steps that made it more difficult to find and watch PEG channels. Decl. of Anthony Vigue ¶¶ 4–5, 9 (ECF No. 25). First, cable operators began moving PEG channels from their long-standing channel positions in the single-digits to hard-to-find subchannels or channel positions in the 1300 block of channels, a region dubbed "digital Siberia." *Id*. Viewers had difficulty finding their local PEG channels, and the problem was compounded by the fact that the electronic programming guide identifies PEG channels only as "LOCAL" and without a description of programming that is seen for other channels. *Id*. ¶¶ 14–19. Second, although some PEG stations produce their content in high definition ("**HD**"), cable operators refuse to retransmit that content in HD, instead down converting it to standard definition ("**SD**"). *Id*. ¶¶ 21–22. As a result of cable operators' downgrading, consumers see a smaller, grainier picture on PEG channels than on most other channels. *Id*. ¶ 21; *see* Rebuttal Decl. of Adam Falk ¶ 19 (ECF No.

52). The PEG provisions address these issues by requiring cable operators to move PEG channels back near broadcast channels, to give PEG stations equal billing in the electronic programming guide, and to retransmit PEG station signals in the format in which they are received and at the same signal quality as local broadcast stations. 30-A M.R.S. §§ 3008(5)(D)(1), 3010(5-A), 3010(5-B).

LD 1371 also amends § 3008(5) to address the extension of cable services to more rural areas of Maine. Franchise agreements must now contain a line extension policy with "a minimum density requirement of no more than 15 residences per linear strand mile of aerial cable for areas in which the cable system operator will make cable television service available to every residence." 30-A M.R.S. § 3008(5)(B).

## DISCUSSION

The Plaintiff contends that the PEG provisions and the line extension provision of LD 1371 are preempted by Federal Cable Law and that the PEG provisions violate the First Amendment rights of its cable operator members. I address each argument in turn.

## I.    Preemption

### A.    Legal Standards

#### 1.    Federal Preemption of State Law Generally

Article VI of the Constitution provides that the laws of the United States "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art VI, cl. 2. "[S]tate law that conflicts with federal law is without effect." *Cipollone v. Liggett Grp., Inc.*, 505 U.S.

504, 516 (1992) (internal quotation marks omitted). The Supreme Court has made clear that:

> because the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action. In all pre-emption cases . . . we "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."

*Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

Congress may preempt state law either directly—through an express preemption provision in a federal statute—or implicitly. *Grant's Dairy—Me., LLC v. Comm'r of Me. Dep't of Agric., Food & Rural Res.*, 232 F.3d 8, 15 (1st Cir. 2000). Even where state law is not inconsistent with federal law, "conflict pre-emption exists where . . . the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377 (2015) (internal quotation marks omitted). The Supreme Court has instructed that courts "should not find pre-emption too readily in the absence of clear evidence of a conflict." *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 885 (2000).

### 2.    Preemption under Federal Cable Law

In the 1984 Cable Act, Congress exerted federal authority over cable where there was a need for uniform, national standards, and it ratified local and state control where those authorities were in a better position "to fine tune regulation in a manner that best addresses unique local conditions and needs." Copple, 44 Fed. Comm. L.J. at 39–46. This statutory structure has aptly been described as a "selective

preemption" scheme. *Id.* at 48. The "appropriate size, capacity, and configuration of a cable system," consumer protection issues, and PEG access are matters largely left within state and local control. *Id.* at 39, 41, 57. Even in areas where Congress saw a need for national standards, the statute "preserves a realm of regulatory discretion for state and local regulation of cable television to address local conditions, policies, and needs." *Id.* at 48. For example, the franchise renewal provisions set nation-wide procedures to ensure that local authorities do not unfairly refuse to renew franchises, but they also give local franchising authorities discretion to account for their communities' cable needs and interests. *See* 47 U.S.C. § 546(c)(1).

Federal Cable Law contains several provisions dealing specifically with the division of regulatory authority and with preemption.

- Section 556, which is entitled "Coordination of Federal, State, and local authority," provides:

   **(a)Regulation by States, political subdivisions, State and local agencies, and franchising authorities**

   Nothing in this subchapter shall be construed to affect any authority of any State, political subdivision, or agency thereof, or franchising authority, regarding matters of public health, safety, and welfare, to the extent consistent with the express provisions of this subchapter.

   **(b)State jurisdiction with regard to cable services**

   Nothing in this subchapter shall be construed to restrict a State from exercising jurisdiction with regard to cable services consistent with this subchapter.

   **(c) Preemption**

   [A]ny provision of law of any State, political subdivision, or agency thereof, or franchising authority, or any provision of any franchise

9

granted by such authority, which is inconsistent with this chapter shall be deemed to be preempted and superseded.

47 U.S.C. § 556.

- Section 552(d) provides that "[n]othing in this subchapter shall be construed to prohibit any State or any franchising authority from enacting or enforcing any consumer protection law, to the extent not specifically preempted by this subchapter." 47 U.S.C. § 552(d).

- Section 544(a) provides that "any franchising authority may not regulate the services, facilities, and equipment provided by a cable operator except to the extent consistent with this subchapter." 47 U.S.C. § 544(a).

- Section 544(f)(1), which is entitled "Limitation on regulatory powers of Federal agencies, States, or franchising authorities" provides: "Any Federal agency, State, or franchising authority may not impose requirements regarding the provision or content of cable services, except as expressly provided in this subchapter." 47 U.S.C. § 544(f). I recently decided, in agreement with the majority of courts that have addressed the issue, that § 544(f) was aimed specifically at keeping governmental authorities from dictating the programming to be provided over a cable system or otherwise imposing content-based requirements. *Comcast of Me./N.H., Inc., v. Mills*, No. 1:19-CV-410, 2019 WL 6999107 (D. Me. Dec. 20, 2019) (following *United Video, Inc. v. FCC*, 890 F.2d 1173 (D.C. Cir. 1989)).

### 3.   Facial Challenges

The Plaintiff seeks to have the four provisions of LD 1371 struck down as facially unconstitutional. Facial challenges are generally disfavored because they are often based on speculation, contrary to principles of judicial restraint, and subversive of the democratic process. *Wash. State Grange v. Wash. State Republican Party,* 552 U.S. 442, 450–51 (2008) (citations omitted).

> To succeed in a typical facial attack, [the moving party] would have to establish "that no set of circumstances exists under which [the Act] would be valid," *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987), or that the statute lacks any "plainly legitimate sweep," *Washington v. Glucksberg,* 521 U.S. 702, 740, n. 7, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (STEVENS, J., concurring in judgments) (internal quotation marks omitted).

*United States v. Stevens,* 559 U.S. 460, 472 (2010) (noting a dispute as to which standard applies but sidestepping the issue). The First Circuit has applied the *Salerno* standard to a facial preemption challenge. *See Pharm. Research & Mfrs. of Am. v. Concannon,* 249 F.3d 66, 77–78 (1st Cir. 2001), *aff'd sub nom. Pharm. Research & Mfrs. of Am. v. Walsh,* 538 U.S. 644 (2003); *Ouellette v. Mills,* 91 F. Supp. 3d 1, 6 (D. Me. 2015). "The existence of a hypothetical or potential conflict is insufficient to warrant the pre-emption of the state statute." *Rice v. Norman Williams Co.,* 458 U.S. 654, 659 (1982).

### B.   The Challenged Provisions

### 1.   The Line Extension Provision

The Plaintiff argues that the line extension provision is preempted for two reasons. First, the Plaintiff contends that the State's role in dictating the line extension terms of franchise agreements is inconsistent with the structure of Federal

11

Cable Law. Second, the Plaintiff argues that the line extension provision conflicts with the franchise renewal procedures, specifically with 47 U.S.C. § 546(c)(1)(D), which requires renewal requirements to be reasonable to meet community needs given the cost of implementation. Pl.'s Mot. for Prel. Inj. ("**Mot.**") 7–8 (ECF No. 3). The State sees no conflict between LD 1371 and § 546(c)(1)(D), and it counters that the line extension provision is expressly authorized by § 541(a)(4)(A), a provision that discusses universal coverage. The State also notes that because the line extension requirement is clearly reasonable in some applications, its constitutionality can only be challenged on an as-applied basis, rather than a facial one.

### a.    State's Power to Mandate Terms

I begin with the Plaintiff's argument that the line extension provision conflicts with the structure of Federal Cable Law, which envisions that decisions about line extension will be made by franchising authorities and cable operators during the franchise renewal process, not mandated by the State. Mot. 9. The Plaintiff is correct that line extension requirements are within the purview of local franchising authorities. 47 U.S.C. § 552(a)(2) (franchising authority may establish and enforce "construction schedules and other construction-related requirements, including construction-related performance requirements, of the cable operator").[4] The

---

[4]      *See* House Report 98-934 at 4696 ("extension of service" issues intended to be "subject to state and local authority"); *see also Union CATV, Inc. v. City of Sturgis*, 107 F.3d 434, 442 (6th Cir. 1997) (reviewing franchising authority's decision not to renew franchise because cable operator would not extend service); *Housatonic Cable Vision Co. v. Dep't of Public Util. Control*, 622 F. Supp. 798, 807 (D. Conn. 1985) ("Congress did not take away the power of the state as franchising authority to require that a cable operator construct a given portion of its franchise area on a specified schedule.").

Plaintiff's argument focuses on the State's authority—or lack thereof—to impose a blanket requirement for all municipal franchising authorities.

Federal Cable Law does not restrict state authority to dictate terms in municipal franchise agreements. Section 556, which is entitled "Coordination of Federal, State, and local authority," provides: "Nothing in this subchapter shall be construed to affect any authority of any state, political subdivision, or agency thereof, or franchising authority, regarding matters of public health, safety, and welfare, to the extent consistent with the express provisions of this subchapter." 47 U.S.C. § 556(a). It is unclear whether § 556(a) is intended to address the relationship *between* states and local authorities, and therefore it is appropriate to review the legislative history. *See Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011) ("[C]lear evidence of congressional intent may illuminate ambiguous text."). The comprehensive House Report for the 1984 Cable Act clarifies that § 556 was not intended:

> to upset the traditional relationship between state and local governments, under which a local government is a political subdivision of the state and derives its authority from the state. . . . [T]he state may exercise its authority over cable either by establishing a state franchising authority *or by placing conditions on a local government's grant of a cable franchise.* A state may not, with regard to such a requirement, enact a statute which requires compliance prior to the expiration of the current franchise.

House Report 98-934 at 4731 (emphasis added).

Because Maine's municipal franchising authorities derive their power from the State, the Maine Legislature has the right to dictate the terms of municipal franchise agreements, including line extension requirements, so long as it does not require

compliance prior to the expiration of a current franchise. The State has acknowledged that the line extension requirement does not apply to existing franchises.[5] Accordingly, the Plaintiff has not established that the line extension requirement is inconsistent with the structure of Federal Cable Law just because the State, rather than the franchising authority, has established the line extension requirement.

### b.    Reasonable to Meet Community Needs

The Plaintiff also argues that the line extension provision is inconsistent with Federal Cable Law's renewal provision, which requires franchising authorities to consider the "cable-related community needs and interests, taking into account the cost of meeting such needs and interests." 47 U.S.C. § 546(c)(1)(D). The Plaintiff contends that the line extension provision conflicts with the renewal provision because the State did not make factual findings that the line extension provision was "reasonable or in communities' best interests." Mot. 9.

The problem with this argument is that it assumes that the State is making the final line extension decision for franchising authorities. However, the Maine Legislature, in enacting LD 1371, is not renewing franchise agreements. Rather it is making a state-wide policy decision that cable services should be extended to all areas where there are 15 residences per linear strand mile. The franchising authorities

---

[5]      At oral argument, the State indicated that it considers the line extension requirement to have prospective application only. In other words, a franchising authority must add the standard to a franchise agreement when the franchise is up for renewal. *See* 30-A M.R.S. § 3008; Tr. of Oral Arg. 14–15 (ECF No. 56) (Attorney General conceding that the line extension requirement is prospective). I accept the State's limiting construction offered at oral argument. *Nat'l Org. for Marriage v. McKee,* 649 F.3d 34, 66 (1st Cir. 2011) (citing *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 494 n.5 (1982)) ("In evaluating a facial challenge to a state law, a federal court must . . . consider any limiting construction that a state court or enforcement agency has proffered.").

must still negotiate the renewal of their franchise agreements, including line extension provisions.[6] Because the State is not acting as the franchising authority, it is not required to conduct the factfinding necessary for an administrative hearing under § 546(c)(1).

### c.   Plaintiff's Facial Challenge

In order to prevail on its facial challenge, the Plaintiff must show that no set of circumstances exists in which the line extension requirement would be valid or that the State provision lacks a plainly legitimate sweep. The Plaintiff argues that the line extension provision "is unlawful *in every case*" because it circumvents the requirement that renewal provisions be reasonable to meet community needs in light of the implementation costs. Reply 3 (ECF No. 51); *see* 47 U.S.C. § 546(c)(1)(D). But, as just discussed, the State is not denying the renewal of a franchise, and Federal Cable Law does not prohibit States from imposing requirements on franchise agreements negotiated by municipalities.

While it is possible that the line extension requirement could be unreasonable given the costs of implementation in some municipalities, the Plaintiff has not met its burden of showing that the law will be unconstitutional in every application or that it lacks a plainly legitimate sweep. NCTA submitted an affidavit by Charter Communications that indicates that "some" of Charter's 292 "Maine franchise agreements include specific line-extension requirements of *up to* 43 homes-per-mile"

---

[6]      Notably, LD 1371 does not stop a franchising authority from requiring a cable operator to extend services to areas with less than 15 residences per linear strand mile.

and that the line extension provision "would alter a *significant number* of the franchise agreements Charter operates under in Maine, the *broad majority* of which do not require Charter to expand lines to the density level specified in the Maine Act." Decl. of Adam Falk ¶¶ 15, 17 (emphasis added) (ECF No. 3-1). Charter declares that the cost of the line extension will run into the "tens of thousands of dollars per mile." *Id.* ¶ 18. Similarly, an affidavit submitted by Comcast avers that all fifteen of Comcast's "Maine franchise agreements contain line-extension policies that range from 17 to 30 homes-per-mile for aerial lines, with alternative density requirements for underground lines." Decl. of Mark Reilly ¶ 13 (ECF No. 3-2). Comcast estimates that the cost per mile to expand service to meet the State's line extension requirement could exceed $100,000 per mile. *Id.* ¶ 15. The Plaintiff fails to demonstrate how many municipalities will be affected or how many miles will require extension, and it appears from these affidavits that at least some municipalities might not be affected at all.[7] *Cf. Cal. Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572 (1987) (state commission's identification of a possible set of permit conditions not preempted by federal law sufficient to rebuff company's facial challenge to state law requiring permit).

It is impossible to state on the record before me that there exists no set of circumstances under which the line extension provision would be valid. It makes more sense to allow cable operators to challenge the provision on a case by case basis,

---

[7]     The State proffered at oral argument that there are already communities that use the 15 homes per linear mile standard. Tr. of Oral Arg. 17–18.

where a factual record can be developed to show whether a line extension term required by a particular franchising authority is reasonable to meet the community's needs in light of the costs. 47 U.S.C. § 546(c)(1).

Similarly, the Plaintiff has failed to show that the line extension requirement lacks a plainly legitimate sweep. As the State points out, the only provision in Federal Cable Law that expressly addresses line extension provides that a franchising authority "shall allow the applicant's cable system a reasonable period of time to become capable of providing cable service to *all* households in the franchise area." 47 U.S.C. § 541(a)(4)(A) (emphasis added). This provision, first enacted in 1984, suggests that franchising authorities can require universal buildout, *provided* they give cable operators enough time to do so.[8] The House Report from the 1984 Cable Act also discusses the goal of "providing all Americans with access to a technology that will become an increasingly important part of our national communications network." House Report 98-934 at 4657. Given this language, it would be difficult to show that Maine's 15-residence line extension requirement lacked a plainly legitimate sweep.

On the record before me, I conclude that the Plaintiff's facial challenge to the line extension provision fails.

---

[8]     The State contends that § 541(a)(4)(A) is express authorization for the State's line extension policy. Opp'n 12 (ECF No. 24). The Plaintiff argues that § 541(a)(4)(A) only limits a franchising authority's rights. Reply 1 (ECF No. 51) (citing *All. for Cmty. Media v. FCC,* 529 F.3d 763 (6th Cir. 2008) (deferring to FCC ruling that franchising authority's refusal to grant franchise because of applicant's unwillingness to meet universal build-out mandates was unreasonable refusal to award competitive franchise under 47 U.S.C. § 541(a)(1))). Because I cite § 541(a)(4)(A) only as support for the line extension's plainly legitimate sweep, I need not decide this issue.

17

### 2.   PEG Provisions

The Plaintiff argues that the PEG provisions in LD 1371 also are preempted because they conflict with Federal Cable Law. Specifically, the Plaintiff contends that the PEG provisions exceed the limited authority that Federal Cable Law bestows on franchising authorities in the PEG channel realm. Mot. 9–10 (citing 47 U.S.C. §§ 531(a), 541(a)(4)). The State counters that franchising authorities are given broad authority to make and enforce requirements related to PEG channels and that the State can enact the PEG provisions, effective immediately, as consumer protection laws. Opp'n 14–15 (ECF No. 24) (citing 47 U.S.C. §§ 531(c), 552(d)(1)).

### a.   Federal Law Governing PEG Channels

Federal Cable Law does not define the term "public, educational, or governmental use." The Supreme Court has said that PEG channels "are channels that, over the years, local governments have required cable system operators to set aside for public, educational, or governmental purposes as part of the consideration an operator gives in return for permission to install cables under city streets and to use public rights-of-way." *Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*, 518 U.S. 727, 734 (1996) (plurality).

Federal Cable Law also does not dictate how PEG channels are to operate, instead giving franchising authorities the right to set requirements for PEG channels as part of their initial franchise agreements and renewals. 47 U.S.C. §§ 531(b), 541; Copple, 44 Fed. Comm. L.J. at 148 (Federal Cable Law leaves "the majority of questions regarding the designation and administration of PEG channels to state and local authorities.").

18

The parties point to two provisions in Federal Cable Law that deal specifically with PEG channels. The first, found in the general franchise provision, states: "In awarding a franchise, a franchising authority . . . may require adequate assurance that the cable operator will provide adequate public, educational, and governmental access channel capacity, facilities, or financial support." 47 U.S.C. § 541(a)(4).

The second provision, found at 47 U.S.C. § 531, is devoted entirely to PEG channels.[9] Section 531(a) allows franchising authorities to require that a cable operator designate space for PEG channels. 47 U.S.C. § 531(a). Section 531(b) gives franchising authorities the right to "require rules and procedures for the *use* of the [PEG] channel capacity designated pursuant to this section." 47 U.S.C. § 531(b) (emphasis added). Section 531(c) gives a franchising authority the right to enforce any requirements contained within its franchise agreement, including any provisions for "services, facilities, or equipment" that relate to PEG channel capacity.[10]

---

[9]      For this case, the relevant provisions of § 531 are as follows:

(a) A franchising authority may establish requirements in a franchise with respect to the designation or use of channel capacity for public, educational, or governmental use only to the extent provided in this section.

(b) A franchising authority may in its request for proposals require as part of a franchise, and may require as part of a cable operator's proposal for a franchise renewal, subject to section 546 of this title, that channel capacity be designated for public, educational, or governmental use . . . and may require rules and procedures for the use of the channel capacity designated pursuant to this section.

(c) A franchising authority may enforce any requirement in any franchise regarding the providing or use of such channel capacity. Such enforcement authority includes the authority to enforce any provisions of the franchise for services, facilities, or equipment proposed by the cable operator which relate to public, educational, or governmental use of channel capacity, whether or not required by the franchising authority pursuant to subsection (b).

47 U.S.C. § 531(a)–(c).

[10]      Based on the language of § 531(a) that franchising authorities may include PEG requirements "only to the extent provided in this section," and the language in § 541(a)(4)(B) that franchising authorities can establish requirements for "adequate" PEG service, the Plaintiff argues that

A third provision of Federal Cable Law is also relevant. Section 552 provides that "[n]othing in this subchapter shall be construed to prohibit any State or any franchising authority from enacting or enforcing any consumer protection law, to the extent not specifically preempted by this subchapter." 47 U.S.C. § 552(d). All three PEG provisions were added to the State law governing "Consumer rights and protection relating to cable television service," 30-A M.R.S. § 3010. In enacting the PEG provisions, the State has relied on its consumer protection authority, rather than its authority to place conditions on a local government's grant of a cable franchise as it did with the line extension provision.[11] Because the State is not acting

---

franchising authorities may only impose PEG requirements that are expressly authorized by Federal Cable Law and that they may not impose requirements that go beyond "adequate." *See* Reply 3–4. Because Federal Cable Law says nothing about PEG channel placement, programming guides, or channel resolution, the Plaintiff contends that these PEG requirements are preempted. The Plaintiff's cramped reading is a riff on its more general claim that Federal Cable Law preempts states and franchising authorities from acting without specific federal authorization to do so. I reject this interpretation as it is contrary to the clear intent of Congress to rely "on the local franchising process as the primary means of cable television regulation, while defining and limiting the authority that a franchising authority may exercise through the franchise process." House Report 98-934 at 4656. If states and franchising authorities could not act unless they found express authorization in Federal Cable Law, they would be unable to serve as the primary means of cable television regulation. As one commentator pointed out shortly after the 1984 Act went into effect:

> The regulation of cable television . . . involves innumerable issues ranging from burning questions of content control to the most benign ministerial matters. The Cable Act only definitively addresses a handful of these issues. Under the total preemption theory, state and local governments would be without any authority to address the matters ignored by the Act.

R. Copple, *Cable Television and the Allocation of Regulatory Power: A Study of Government Demarcation and Roles,* 44 Fed. Comm. L.J. 1, 45–46 (1991) (concluding that 1984 Cable Act only selectively preempts state and local franchising authorities). Particularly in the context of PEG channels, where local interests predominate, it makes little sense to require local authorities to find explicit federal authority to act. *Cf. Dearborn v. Comcast of Mich. III, Inc.,* No. 08-10156, 2008 WL 4534167, at *5 (E.D. Mich. Oct. 3, 2008), as amended (Nov. 25, 2008) (rejecting Comcast's "narrow reading" that § 531 does not allow for PEG channel placement provision).

[11]    For the channel placement provision, the State used both its consumer protection power and its power to mandate terms of municipal franchise agreements. *See* 30-A M.R.S. §§ 3008(5); 3010. Because the franchising authorities have the right to impose requirements regarding the use of PEG

as the franchising authority or dictating the terms of the franchise agreement, 47 U.S.C. §§ 531 and 541, which address only what a franchising authority may or may not do,[12] are not applicable here.

Further, as I discussed in the line extension provision section, when a state is dictating the terms of municipal franchise agreements, it cannot require that a particular provision be included before the expiration of the current franchise. House Report 98-934 at 4731. However nothing in Federal Cable Law indicates that a state cannot impose a *consumer protection requirement* on an existing franchise.[13] I am bound by the plain language of § 552(d) not to "construe[]" Federal Cable Law to prohibit the State from enacting or enforcing any consumer protection law unless it

---

channels, I see no conflict between the channel placement provision and 47 U.S.C. § 531, at least as it pertains to franchise renewals going forward.

[12]     Congress knew how to delineate between franchising authorities and states, and it did so throughout Federal Cable Law. *Compare* 47 U.S.C. § 544(b) ("the franchising authority"), *with* § 544(e) ("No State or franchising authority"), *and* § 544(f) ("Any Federal agency, State, or franchising authority"), *and* § 552(d)(1) ("any State, or any franchising authority").

[13]     The Plaintiff cites the 1984 House Report discussing § 556 as authority for its claim that the State may not impose any of the PEG provisions on existing franchises. Reply 10. That report states:

> If, under . . . any state law, a requirement imposed upon a cable operator must be reflected in a franchise, the state may exercise its authority over cable . . . by placing conditions on a local government's grant of a cable franchise. *A state may not, with regard to such a requirement, enact a statute which requires compliance prior to the expiration of the current franchise.* For example, [if] . . . a state enacts a statute requiring a new PEG channel, that provision may only be phased in as each franchise comes up for renewal.

House Report 98-934 at 4731 (emphasis added). This statement from the legislative history seems to apply only to the channel placement provision, which is located both in § 3010's consumer protection provision *and* in § 3008's subsection governing requirements for franchise agreements. It is not clear that Congress intended it to apply to a state's consumer protections laws. Because the language cited by the Plaintiff from the House Report did not make it into § 556, there is nothing in Federal Cable Law that "specifically" prevents the State from imposing a consumer protection law on cable operators during existing franchises.

21

is specifically preempted by Federal Cable Law. Because § 552(d) would inform the State's authority to implement consumer protection measures, I must consider: (1) whether each PEG provision is a consumer protection law; and, if so, (2) whether there is anything within Federal Cable Law that specifically preempts it.

### b.     The Individual PEG Provisions

#### i.     Channel Placement and Basic Tier Requirements

LD 1371 adds a new subsection to the State's consumer protection law for cable, requiring cable operators to carry PEG channels on the basic tier and prohibiting cable operators from separating PEG channels numerically from other local broadcast channels or changing the numbers assigned to PEG channels unless agreed to by the originator. 30-A M.R.S. § 3010(5-A). Section 3010(5-A) also requires cable operators to restore PEG channels that have been moved from their previous channel numbers without the consent of the originator.[14]

I agree with the State that the channel placement requirements are consumer protection laws.[15] In enacting the channel placement provisions, the Maine

---

[14]     As discussed above, LD 1371 also amends 30-A M.R.S. § 3008 to require franchising authorities to include in their franchise agreements a requirement that PEG channels "be carried in the same manner and numerical location sequence as are the local broadcast channels originating from the State and carried on the cable television system pursuant to [30-A M.R.S. § 3010(5-A)]." 2019 Me. Laws, c. 245, § 3.

[15]     Because Federal Cable Law does not define "consumer protection," I consider how that term is commonly understood. *See FCC v. AT&T Inc.*, 562 U.S. 397, 403 (2011) ("When a statute does not define a term, we typically give the phrase its ordinary meaning.") (internal quotation marks omitted); *Marrero-Garcia v. Irizarry*, 33 F.3d 117, 123 (1st Cir. 1994) (applying "common understanding" of the term "consumer," because the term was not defined by law). Consumer protection is "the protection of buyers of goods and services against low quality or dangerous products and advertisements that deceive people." Consumer Protection, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/consumer-protection (last visited Mar. 11, 2020).

Legislature was responding to consumer complaints that they could not locate PEG channels after cable operators removed them from the low number stations that they had long occupied and relocated them to digital Siberia. Decl. of Anthony Vigue ¶¶ 4–5, 9. Public participation in and engagement with local government declined when the PEG channels were relocated. Decl. of Christopher Hall ¶¶ 11–12 (ECF No. 28). The State, by requiring that PEG channels be placed near the local broadcast channels and on the basic tier, is exercising its police power to ensure that the PEG channels—considered vital to an informed citizenry—are widely and easily accessible. Anyone who has missed the first ten minutes of a television program because she was scrolling through the channels in search of it knows that the process can diminish the quality of the viewing experience. As such, the channel placement requirements qualify as consumer protection laws.

Having found that the PEG channel placement requirements are consumer protection measures, I must now decide whether the requirements are "specifically preempted" by any provision of Federal Cable Law. *See* 47 U.S.C. § 552(d). The Plaintiff argues that the State's requirement that PEG channels be carried on the basic tier conflicts with a federal cable rate regulation found at 47 U.S.C. § 543(b)(7), and with provisions that specify channel placement requirements for local commercial television stations and noncommercial educational television stations found at 47 U.S.C. §§ 534(b)(6), 535(g)(5). Mot. 10. I address each argument in turn.

The Plaintiff argues that "under federal law, the only cable systems that may be required to carry PEG channels on their 'basic service tier' are those that are not

23

subject to 'effective competition.' " Mot. 10. Section 543 authorizes states to regulate rates charged by cable operators not subject to effective competition. Section 543(b)(7) provides that cable systems that lack effective competition must provide a "separately available basic service tier" with certain minimum components, including PEG programming. 47 U.S.C. § 543(b)(7). The Plaintiff asserts that, because Maine is subject to effective competition, § 543(b)(7) is inapplicable and conflicts with the requirement that PEG channels be carried on the basic tier. Mot. 10. But, the federal requirement that cable systems not subject to effective competition *must* include PEG channels on the basic tier, says nothing about whether states *may* require cable operators subject to effective competition to carry PEG channels on the basic tier.[16] Section 543(b)(7) therefore does not "specifically preempt[]" the State from requiring PEG channels to be carried on the basic tier.

Similarly, the Plaintiff argues that the channel placement provisions are preempted because Congress enacted channel placement requirements for local commercial television stations and noncommercial educational television stations in

---

[16]     To the extent there is any ambiguity, it is appropriate to look to the legislative history. The House Report on § 543(b)(7) states:

> With respect to PEG access channels, it is not the Committee's intent to modify the terms of any franchise provision either requiring or permitting the carriage of such programming on a tier of service other than the basic service tier.

H.R. Rep. 102-628 at 85 (1992). While this legislative history does not definitively provide that states can require cable operators subject to effective competition to put PEG channels on the basic tier, it does reflect an understanding that franchising authorities could and did in some instances require PEG programming to be on a specific tier, and it shows that Congress did not wish to interfere with those requirements. *See In Re Implementation of Section of the Cable Television Consumer Protection and Competition Act of 1992 Rate Regulation*, 8 FCC Rcd 5631, 5738 (1993) (notwithstanding § 543(b)(7), "franchising authorities may require carriage of PEG channels on a non-basic tier").

§§ 534(b)(6) and 535(g)(5), respectively, but did not do so for PEG channels in § 531. Mot. 10 (citing *Russello v. United States*, 464 U.S. 16, 23 (1983) (Where Congress "includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (internal quotation marks omitted)). Again, Congress's decision to require specific channel placement for certain classes of stations says nothing about a state or franchising authority's right to require specific channel placement for PEG stations.[17] Because the Plaintiff has shown me no provision of Federal Cable Law that specifically prohibits the State from enacting the channel placement requirements as a consumer protection measure, I conclude that they are not preempted.

### ii.    HD/SD Requirements

LD 1371 amends Maine's cable consumer protection statute to require cable operators to carry PEG channels in both HD format and SD format in the same manner that local broadcast channels are provided. 30-A M.R.S. § 3010(5-B).

As to the question of whether the HD/SD requirements are consumer protection laws, I consider the evidence that cable operators are down-converting PEG channels' programming transmitted in HD format to SD format, resulting in a smaller, grainier picture than other channels. Decl. of Anthony Vigue ¶ 21. The effect

---

[17]     Congress treated PEG channels (where operational details were left to local authorities) differently from local commercial and noncommercial television stations (where Congress imposed detailed operational requirements on cable operators). Congress perceived a need to protect the latter class of stations by applying national standards, and it required their carriage on cable system according to strict rules. But Congress left PEG channels in the hands of local authorities who could best set requirements for their use.

is that viewers "skip over" PEG channels. *Id.* ¶ 23. Better picture quality will improve not only the visibility but the credibility of PEG channels with subscribers. *See* Decl. of Patrick Bonsant ¶ 10 (ECF No. 27); Decl. of Andrew Collar ¶ 6 (ECF No. 29); Decl. of William Bridoeo ¶ 6 (ECF No. 35). Ensuring that PEG channel signals are not downgraded and that PEG channels have picture quality comparable to almost all of the other channels directly relates to the quality of PEG programming. As such, I conclude that the HD/SD requirements are appropriately considered consumer protection laws.

The Plaintiff contends that 47 U.S.C. § 544(e), which deals with technical standards, specifically preempts the HD/SD requirements. Section 544(e) provides in full:

> Within one year after October 5, 1992, the Commission shall prescribe regulations which establish minimum technical standards relating to cable systems' technical operation and signal quality. The Commission shall update such standards periodically to reflect improvements in technology. No state or franchising authority may prohibit, condition, or restrict a cable system's use of any type of subscriber equipment or any transmission technology.

47 U.S.C. § 544(e). The Plaintiff argues that requiring cable operators to retransmit PEG channels in HD either imposes a "condition . . . [on] a cable system's use of . . . transmission technology" or is a "signal quality" issue within the realm of the FCC. In either case, according to the Plaintiff, § 544(e) specifically preempts the HD/SD requirements. Mot 11–12. The State counters that HD/SD are not "transmission technologies" at all.[18] Even if they are, the State contends that the requirement that

---

[18]     The Plaintiff's Reply claims that "Maine says that HD is not a 'technology.'" Reply. 6–7 (citing Opp'n 16). This grossly misstates the State's argument. *See* Opp'n 16 ("First, plaintiff cites no support

cable operators retransmit PEG channels in HD and SD does not "'prohibit, condition, or restrict' a cable operator's use of [a transmission] technology" because cable operators are already using HD technology to deliver virtually all channels to subscribers. Opp'n 17. In response to the Plaintiff's argument that HD/SD is a signal quality issue, the State argues that § 544(e) only mandates that the FCC set minimum technical standards with regard to signal quality, language that does not vest the FCC with exclusive authority over signal quality. Opp'n 17.[19]

To begin, the Plaintiff offers little evidentiary support and no expert guidance for its contention that HD/SD is a "transmission technology." The affidavits that the Plaintiff submitted describe SD as a "transmission format" or a "technical format" and do not assert that HD/SD is a transmission technology. Decl. of Adam Falk ¶¶ 24–25, 38; Decl. of Mark Reilly ¶¶ 20, 22–23; Rebuttal Decl. of Mark Reilly ¶ 8 (ECF No. 51-1). In contrast, the State's affiant claims:

---

for the proposition that requiring PEG channels to be provided in HD format is the regulation of a 'transmission technology.' In fact, HD is not a 'transmission technology.'"); *id.* ("HD and SD simply refer to the resolution of the video, and HD programs can be transmitted by different technologies, including, for example, by fiber optic lines and coaxial cables and by both analog and digital signals. [Decl. of Anthony Vigue] ¶ 26. HD is not a 'transmission technology.'").

[19]     The State also contends that § 544(e) does not apply to requirements imposed on PEG channels, as provided for in § 531. The State cites *City of Dearborn v. Comcast of Michigan III, Inc.*, No. 08-10156, 2008 WL 5084197, at *2 (E.D. Mich. Nov. 24, 2008), where the court addressed whether a local franchising authority could require Comcast to retransmit PEG channels in digital or analog format. The Court concluded that § 544(e)'s specific limitation on state and local franchising authorities' requirements on "subscriber equipment or transmission technology" did not trump § 531(c)'s language allowing franchising authorities to enforce *any* requirement contained in a franchise agreement. *Id.* ("Because 47 U.S.C. § 544(e) does not affect section 531, it does not preempt Plaintiffs' ability to enforce PEG channel requirements in their franchise agreements."). *Dearborn* is distinguishable. The present case involves whether a state can unilaterally enact a consumer protection law applicable to all existing franchises under § 552. *Dearborn* involved a franchising authority's right to enforce terms in a negotiated franchise agreement. Because I conclude that the Plaintiff has not established that LD 1371 regulates transmission technology, I need not decide whether *Dearborn* is correct that § 544(e) does not apply to any requirements on PEG channels.

> HD is a broadcast standard for the resolution of the picture that the
> viewer sees . . . . HD is not a "transmission technology." Transmission
> technology refers to the method by which the signal travels from the
> source to the viewer, for example, by a fiber optic line or a coaxial cable
> or by an analog or digital signal. HD programs can be transmitted by
> different technologies, including, for example, fiber optic lines and
> coaxial cables and by both analog and digital signals.

Decl. of Anthony Vigue ¶ 26.

The FCC has acknowledged that the line between impermissible regulations

of "transmission technology," as prohibited by 47 U.S.C. § 544(e), and permissible

regulations of "facilities and equipment," as provided for in 47 U.S.C. § 544(b), is a

difficult one to draw. *In Re Implementation of Cable Act Reform Provisions of the*

*Telecommunications Act of 1996, Report and Order*, 14 FCC Rcd 5296, 5356–57 ¶ 141.

The FCC has stated:

> "Transmission technology" is not a defined term in the Communications
> Act nor does the legislative history help to define its breadth. Rather,
> Congress appears to have used the phrase in the everyday sense in
> which it has been used in discussions of communications policy issues.
> A review of the usage of the phrase indicates that it has been frequently
> used to include both the transmission medium, i.e. microwave, satellite,
> coaxial cable, twisted pair copper telephone lines, and fiber optic
> systems, and the specific modulation or communications format, i.e.
> analog or digital communications. Based on the foregoing, we believe,
> for example, that local authorities may not control whether a cable
> operator uses digital or analog transmissions nor determine whether its
> transmission plant is composed of coaxial cable, fiber optic cable, or
> microwave radio facilities.

*Id.* at 5356–57 ¶ 141; *see also In Re Implementation of Cable Act Reform Provisions*

*of Telecommunications Act of 1996*, 17 FCC Rcd 7609, 7610 ¶ 4 (2002). While the FCC

seems to believe that "transmission technology" is broader than Mr. Vigue

represented, the FCC does not say anything about whether HD/SD is a transmission

28

technology.[20] Based on the evidence before me, I can only conclude that HD/SD is not a "transmission technology" as that term is used in § 544(e).

Perhaps the Plaintiff did not attempt to introduce evidence on transmission technology because, as it concedes in its briefing, "Congress has made clear that the carriage of programming in HD is a '[s]ignal quality' issue." Mot. 11.[21] The Plaintiff argues that § 544(e) gives the FCC the exclusive right to set both the ceiling and floor for signal quality, leaving no room for state regulations.

Assuming HD technology is a "signal quality" issue, § 544(e) does not "specifically preempt[]" Maine's consumer protection law. Congress demonstrated that it knows how to restrict state authority in § 544(e), and it did so with regard to "subscriber equipment" and "transmission technology." It also demonstrated that it considered the issue of "signal quality." *See* 47 U.S.C. § 544(e). The fact that "signal quality" is not included with "subscriber equipment or any transmission technology" in the list of things a state cannot "prohibit, condition, or restrict," leads me to

---

[20]   The Plaintiff claims that the FCC has held that § 544(e) "prohibits a franchising authority from requiring a cable operator to transmit programming in a particular 'format' and from 'controlling whether a cable operator uses' a particular format for 'transmissions.' " Mot. 11 (ECF No. 3). However, the FCC reports cited by the Plaintiff say nothing about whether HD/SD is a transmission technology.

[21]   To support this claim, the Plaintiff cites 47 U.S.C. § 534(b)(4)(B), a subsection of the provision on carriage of local commercial television signals dealing with "signal quality," which contains a provision that states: "At such time as the Commission prescribes modifications of the standards for television broadcast signals, the Commission shall initiate a proceeding to establish any changes in the signal carriage requirements of cable television systems necessary to ensure cable carriage of such broadcast signals of local commercial television stations which have been changed to conform with such modified standards." 47 U.S.C. § 534(b)(4)(B). The Plaintiff also cites a House Report that states " 'advanced television' includes 'the authorization of broadcast high definition television (HDTV).' " Mot. 12.

conclude that § 544(e) does not specifically preempt the HD/SD requirements if they do regulate signal quality.[22]

The Plaintiff bears the burden of establishing specific preemption, and it has failed to show that the HD/SD requirements are regulations of transmission technology or that the requirements are impermissible regulations of signal quality. As such they are not specifically preempted by 47 U.S.C. § 544(e).

### iii.    Programming Guide Requirements

LD 1371 amends the State's cable consumer protection statute to require that cable operators assist PEG channel originators with using the electronic

---

[22]    Although I specifically asked at oral argument what the FCC's minimum technical standards were, the Plaintiff failed to demonstrate that the HD/SD requirements exceed the standards set by the FCC.

THE COURT: So what has the FCC adopted as far as signal quality for cable providers?

MR. SYMONS: They—they adopt—signal quality includes things like the—the—making sure you're transmitting all the bits in a bit stream in a particular way, not—all this is all digital now so—.

THE COURT: But it is not like, okay, you have to be at 1000 by 700 pixels or—.

MR. SYMONS: No.

THE COURT: -- it doesn't go to that level?

MR. SYMONS: No. . . . [W]hat counts as signal quality from the FCC's standpoint is the beginning and end of signal quality regulation. So, you know, to the extent the FCC says you've got to transmit in, you know, 19.2 kilobits per second standard in order to provide a signal, that's—you know, they— the cities couldn't come in and say, no, it should be 25 kilobits per second, that's better.

Tr. of Oral Arg. 71:22–72:14. The technical standards on signal quality seem to be set forth in 47 C.F.R. § 76.605. That provision does not mention the term "high definition television" or "HDTV," and the highly technical standards contained therein are not understandable without expert assistance. As such, even were I to take Mr. Symon's representations as a proffer of evidence, I still cannot tell whether the State's HD requirement exceeds the current minimum standard for signal quality set by the FCC.

programming guide to identify, view, select, and record PEG channels in the same manner as local broadcast channels. 30-A M.R.S. § 3010(5-B).

As to whether the programming guide requirements fall within the category of consumer protection legislation, the evidence shows that, unlike other channels provided by the cable operators, PEG channels and their programming are not adequately identified in the electronic programming guide. Decl. of Anthony Vigue ¶¶ 11–16; Decl. of William Giroux ¶ 5 (ECF No. 26); Decl. of Steve Eldridge ¶ 6 (ECF No. 30). "In this age of hundreds of available channels, an electronic program guide is, effectively, the only way that subscribers can figure out what is available to watch." Decl. of Anthony Vigue ¶ 11. As with the channel placement requirements, a consumer's ability to locate programming easily relates to the quality of the viewing experience. Ensuring that consumers can access PEG channels is an appropriate subject for consumer protection legislation.

The Plaintiff posits that the programming guide provision is preempted because it is either a "cable service" as defined by 47 U.S.C. § 522(6)[23] or an "information service" as defined by 47 U.S.C. § 153(24).[24] If a programming guide constitutes a cable service, then the Plaintiff contends the programing guide

---

[23]    Under Federal Cable Law, "cable service" includes "subscriber interaction, if any, which is required for the selection or use of such video programming or other programming service." 47 U.S.C. § 522(6)(B).

[24]    "The term 'information service' means the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications, and includes electronic publishing, but does not include any use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service." 47 U.S.C. § 153(24).

requirements are preempted by § 544(f), which prohibits states from imposing "requirements regarding the provision or content of cable services, except as expressly provided in this subchapter." 47 U.S.C. § 544(f)(1). As I have already discussed, § 544(f)(1) is aimed at ensuring that government officials do not dictate the specific programming that cable operators must provide. *See supra* Section I.A.2; House Report 98-934 at 4663. But PEG channels are an exception to Federal Cable Law's general concern with government regulation of content. In the PEG domain, cable operators have no editorial control "over any public, educational, or governmental use of channel capacity," *see* 47 U.S.C. § 531(e), and it is the franchising authority that has editorial control over content.[25] Because cable operators lack editorial control over the use of PEG channels, requiring cable operators to allow PEG channels access to the programming guide does not specifically conflict with § 544(f) as understood in the overall context of Federal Cable Law.

If a programming guide is an information service, the Plaintiff contends that the programming guide requirement is preempted by § 544(b)(1)'s requirement that franchising authorities may not "establish requirements for video programming or other information services." Mot. 13 (citing 47 U.S.C. § 544(b)(1)). As discussed above,

---

[25]    Franchising authorities are generally allowed to regulate in the area of facilities and equipment but not in the area of content. 47 U.S.C. § 544(b)(1) (franchising authorities "may establish requirements for facilities and equipment, but may not, . . . establish requirements for video programming or other information services"); 47 U.S.C. § 544(f) (franchising authorities "may not impose requirements regarding the provision or content of cable services"). The term "services" in Federal Cable Law has been persuasively interpreted to refer to content or subject matter. *RCN Corp v. Newtown Twp.*, No. 02-CV-9361, 2004 WL 315175 (E.D. PA. Feb. 11, 2004). Thus the use of the term "services" in § 531(c) is a strong indication that Congress intended franchising authorities to have editorial control over their own PEG channels. This interpretation squares with § 531(e)'s removal of editorial control from cable operators.

§ 544(b)(1) applies only to franchising authorities, not states. Congress knows how to distinguish between states and franchising authorities, and it does so frequently in other sections of the Federal Cable Act. *See supra* n.12. The State is imposing the electronic programming guide requirement directly on cable operators and is not acting as a franchising authority. Therefore, I conclude that § 544(b)(1) does not "specifically preempt[]" the electronic programming guide provision. *See* 47 U.S.C. § 552(d).

### C.    Preemption Conclusion

Because I find that the Plaintiff has not established that any of the contested provisions in LD 1371 are preempted by Federal Cable Law, I go on to address the Plaintiff's argument that the PEG provisions violate the First Amendment.

## II.   First Amendment

The Plaintiff argues that the PEG provisions violate the First Amendment rights of cable operators because the law limits cable operators' editorial discretion over how to retransmit PEG channels and should be subject to strict scrutiny. Mot. 15–17. The State disagrees.[26] Opp'n 21–23.

The threshold question in a First Amendment challenge is whether government action infringes on a plaintiff's First Amendment rights. *See Turner I*, 512 U.S. at 636. The First Amendment, applied to the State through the Fourteenth

---

[26]    The State understandably misreads the Plaintiff's Motion as challenging the constitutionality of PEG channels in general. Opp'n 21–22. The Plaintiff did state that the federal PEG requirements are constitutionally suspect, *see* Mot. 15, but the Plaintiff later clarified that it is not challenging the constitutionality of the federal PEG requirements. Reply 9 n.13. I note that the Court of Appeals for the District of Columbia Circuit has upheld the federal PEG provisions against a facial First Amendment challenge. *Time Warner Entm't Co. v. FCC*, 93 F.3d 957, 973 (D.C. Cir. 1996).

Amendment, provides that the State "shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.

## A.      Cable Operators' General First Amendment Rights

Generally, cable operators have editorial discretion, protected by the First Amendment, to decide what channels and programming to provide to subscribers and how to do so. *Turner I*, 512 U.S. at 636. In *Turner I*, the Supreme Court wrote that "[t]here can be no disagreement" that

> Cable programmers and cable operators engage in and transmit speech, and they are entitled to the protection of the speech and press[27] provisions of the First Amendment. Through original programming or by exercising editorial discretion over which stations or programs to include in its repertoire, cable programmers and operators seek to communicate messages on a wide variety of topics and in a wide variety of formats.

*Id.* (quotation marks, citations, and alternations omitted). *Turner I* addressed whether Federal Cable Law provisions that require cable operators to carry the signals of certain local broadcast television stations ("**must-carry provisions**") violated the First Amendment rights of cable operators and programmers. *Id.* at 636–37. The Court determined that the must-carry provisions "regulate cable speech in two respects: The rules reduce the number of channels over which cable operators exercise unfettered control, and they render it more difficult for cable programmers to compete for carriage on the limited channels remaining." *Id.* at 637. Ultimately, the Court concluded that intermediate scrutiny was the appropriate level of review

---

[27]      The Plaintiff does not mount a First Amendment challenge based on the freedom of the press.

and that the must-carry provisions survived intermediate scrutiny. *Turner Broad. Sys., Inc. v. FCC* ("*Turner II*")*,* 520 U.S. 180, 185 (1997).

### B.    Cable Operators' Editorial Discretion as Applied to PEG Channels

Notwithstanding the recognition of cable operators' First Amendment editorial discretion in *Turner I*, Federal Cable Law expressly prohibits cable operators from "exercis[ing] any editorial control over any public, educational, or governmental use of channel capacity . . . ." 47 U.S.C. § 531(e). For PEG channels, Congress secured the reins of editorial control in the hands of local franchising authorities. 47 U.S.C. § 531(c), (e).[28]

In *Denver Area Education Telecommunications Consortium, Inc. v. FCC*, the Supreme Court addressed the constitutionality of the 1992 amendments to Federal Cable Law that gave cable operators the right to prohibit obscene programming on leased channels[29] and on PEG channels. *Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*, 518 U.S. 727 (1996). A plurality of the Court upheld the provision as it applied to leased channels but struck down the provision as it applied to PEG channels. One "significant[]" difference between leased and PEG channels was that "cable operators have not historically exercised editorial control" over PEG channels.

---

[28]    Congress considered the "narrowly designed access requirements" for public, educational, governmental, and limited third parties necessary to protect "the First Amendment right of the viewers and listeners to a diversity of information sources," while leaving "cable operator's editorial discretion" intact over the remaining channels, which constituted the "vast majority" of cable's bandwidth. House Report 98-934 at 4671–73.

[29]    Federal Cable Law creates leased access channels, a limited number of channels set aside for lease by persons unaffiliated with the cable operators and who are not subject to cable operators' editorial control. 47 U.S.C. § 532; House Report 98-934 at 4687.

*Id.* at 761 (plurality). In contrast, by allowing cable operators to prohibit offensive content on leased channels, Congress was "restoring to cable operators a degree of the editorial control" that they traditionally held over leased-access channels. *Id.* at 747 (plurality).

In *Denver*, three members of the Supreme Court stated that cable operators' First Amendment rights were "nonexistent, or at least much diminished" in the PEG realm because of the historical practice. 518 U.S. at 761 (plurality). Justices Kennedy and Ginsburg, who did not join the plurality opinion, went further. They explained that cable operators' editorial discretion over PEG channels "never existed." *Id.* at 792–93 (Kennedy, J., concurring). The First Amendment

> editorial discretion of a cable operator is a function of the cable franchise it receives from local government. . . . [I]t is the franchise—the agreement between the cable operator and the local government—that allocates some channels to the full discretion of the cable operator while reserving others for public access.
>
> In providing public access channels under their franchise agreements, cable operators therefore are not exercising their own First Amendment rights.

*Id.* (Kennedy, J., concurring).

Section 531(e) provides that "a cable operator shall not exercise any editorial control over any public, educational, or governmental *use of channel capacity* provided pursuant to this section." 47 U.S.C. § 531(e) (emphasis added). Congress "believe[d] that it [was] integral to the concept of the use of PEG channels that such use be free from any editorial control or supervision by the cable operator." House Report 98-934 at 4684. In the leased channel context, Congress enacted a narrower provision: "A cable operator shall not exercise any editorial control over any video

programming provided pursuant to this section, or in any other way consider the content of such programming." 47 U.S.C. § 532(c)(2). These distinctions are important for evaluating the Plaintiff's claim that cable operators have at least some First Amendment interests in the PEG channel realm.

## C.   Analysis

The Plaintiff acknowledges that its members "may not exercise editorial control *over the content* of PEG programming." Mot. 16 (citing 47 U.S.C. § 531(e)) (emphasis added). But, as just discussed, § 531(e) is broader than the Plaintiff asserts. As such, it comfortably covers matters relating to PEG channel placement, format, and programming guides. These are matters dealing with the "use" of PEG channel capacity, and thus they are outside of cable operators' general editorial control. *See* 47 U.S.C. § 531(e). The Plaintiff cites *Riley v. National Federation of the Blind of N.C., Inc.,* 487 U.S. 781, 790–91 (1998), for the proposition that "[t]he First Amendment mandates that [courts] presume that speakers, not the government, know best both what they want to say and how to say it." Mot. 16. But here it is the franchising authorities, not the cable operators, who are the speakers that get to decide what they want to say and how they want to say it.[30]

---

[30]     To the extent that the State is infringing on editorial discretion, it would be that of local franchising authorities. The Plaintiff initially brought this action against two franchising authorities and the Attorney General, *see* Compl. ¶¶ 12–13, 26, 136, but dismissed the franchising authorities after the Attorney General agreed that he was a proper defendant and the franchising authorities agreed that they would not enforce LD 1371 while this litigation was pending. *See* Stipulation of Dismissal (ECF No. 50).

The Plaintiff argues that cable operators still retain "editorial discretion in deciding how to use scarce bandwidth." Mot. 16.[31] The Plaintiff's reference to "scarce bandwidth" is ironic. In *Turner I*, cable operators argued that regulations of cable should be subjected to heightened scrutiny and not the rational basis review that applied to regulations of broadcast television.[32] *Turner I,* 512 U.S. at 637–39. The *Turner I* Court, in deciding to subject the must-carry provisions to intermediate scrutiny, "relied on the inapplicability of the spectrum scarcity problem to cable." *Denver*, 518 U.S. at 748 (plurality) (discussing *Turner I*).

While the Plaintiff asserts an interest in editorial control over "scarce bandwidth," it does not provide any actual evidence that bandwidth is scarce. Only eleven municipalities served by Comcast have elected to designate PEG channels, and only one-third of Charter's 292 municipalities have designated PEG channels. Decl. of Mark Reilly ¶ 18; Decl. of Adam Falk ¶ 21. In the Standish area, Spectrum has assigned channel numbers ranging from 4 to 2,010, but only 439 channels appear to be currently in use and only four are designated for PEG use. Def.'s Ex. A (ECF

---

[31]   Retransmitting a channel in HD requires four times the bandwidth of retransmitting it in SD. Decl. of Adam Falk ¶ 26 (ECF No. 3-1); Decl. of Mark Reilly ¶ 24 (ECF No. 3-2).

[32]   The Court explained the rationale for "rational basis" review for laws affecting broadcast stations as follows:

> As a general matter, there are more would-be broadcasters than frequencies available in the electromagnetic spectrum. And if two broadcasters were to attempt to transmit over the same frequency in the same locale, they would interfere with one another's signals, so that neither could be heard at all. The scarcity of broadcast frequencies thus required the establishment of some regulatory mechanism to divide the electromagnetic spectrum and assign specific frequencies to particular broadcasters.

*Turner Broad. Sys., Inc. v. FCC* ("*Turner I*"), 512 U.S. 622, 637–38 (1994) (citations omitted).

No. 25-1) (listing of channels offered). Similarly, Spectrum offers roughly 378 channels in Augusta, only three of which are PEG channels. Def.'s Ex. B (ECF No. 25-2) (listing of channels offered).

The Plaintiff's affiants make generic statements that increased bandwidth required by HD for PEG channels will take away from the total bandwidth available. Decl. of Adam Falk ¶ 40; Decl. of Mark Reilly ¶ 22. But there is no evidence that complying with the PEG provisions will significantly impact total bandwidth or that it will affect the cable operators' ability to provide other services. Comcast's Senior Vice President Mark Reilly avers that:

> *Depending on franchising authorities' demands to add additional PEG channels*, an option under many of their current franchise agreements, transmitting PEG channels in HD and SD, as required by the Maine Act, *could* require Comcast to take channel capacity away from other programming networks, or from other services such as broadband Internet service, and use it for PEG channels.

Decl. of Mark Reilly ¶ 30 (emphasis added). Mr. Reilly's doomsday scenario is unsubstantiated and speculative. From the Reilly affidavit, I infer that, at the existing number of PEG channels, there will be no need for Comcast to take channel capacity away from other services. Based on the record before me, there is no evidence that franchising authorities will demand *additional* PEG channels. Nor is it evident that more municipalities will demand PEG channels in the future. *See* Compl. ¶ 50 & n.8 (ECF No. 1) (discussing availability of PEG channel content on municipal websites).

While there might be some circumstances in which PEG franchising requirements could raise constitutional issues,[33] the Plaintiff has not met its burden of showing that the State's PEG provisions infringe on cable operators' First Amendment rights. By enacting the PEG provisions, the State simply seeks to put PEG channels on equal footing with the vast majority of other channels. It seeks to have PEG channels returned to channel placements that they long held. It seeks retransmission in HD, if programming is provided by the originator in HD. It seeks inclusion in the electronic programming guide. These are rules governing the "use" of PEG channels, and the Plaintiff has not shown that they infringe on any First Amendment interest belonging to cable operators.[34]

---

[33]     *Cf. Time Warner*, 93 F.3d at 973 ("PEG franchise conditions . . . [could] raise serious constitutional issues" if, for example, "a local authority . . . require[d] as a franchise condition that a cable operator designate three-quarters of its channels for 'educational' programming, defined in detail by the city council.").

[34]     Even if the PEG provisions do spill over onto the cable operators' editorial discretion to control where things appear in their channel lineup or how things appear in the programming guide, I would conclude that intermediate rather than strict scrutiny would apply. *See Turner I,* 512 U.S. at 662 (applying intermediate scrutiny to must-carry provisions and sustaining law if " 'it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.' ") (citing *United States v. O'Brien*, 391 U.S. 367, 377 (1968)); *cf. Time Warner*, 93 F.3d at 971. Under that standard, I would conclude that the continued viability of PEG channels is an important State interest unrelated to the suppression of free expression. I would also conclude that the PEG provisions serve those State interests and are narrowly tailored to achieve those interests. *See* Decl. of Anthony Vigue ¶¶ 4–5, 9, 11–19, 21 (ECF No. 25); Decl. of William Giroux ¶ 5 (ECF No. 26); Decl. of Steve Eldridge ¶ 6 (ECF No. 30); Decl. of Patrick Bonsant ¶ 10 (ECF No. 27); Decl. of Andrew Collar ¶ 6 (ECF No. 29); Decl. of William Bridoeo ¶ 6 (ECF No. 35).

## CONCLUSION

For the reasons stated above, I **DENY** the Plaintiff's claims for declaratory and injunctive relief (ECF No. 1). The Clerk shall enter judgment for the Defendant. SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 11th day of March, 2020.